**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ANTHONY M. BLAN, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 19-00807-MJH |
| | ) | |
| v. | ) | Judge Marilyn J. Horan |
| | ) | |
| CLASSIC LIMOUSINE TRANSPORTATION, | ) | |
| LLC, AZUR ENTERPRISES, LLC, and JAMES | ) | |
| SHENTO, Chief Operating Officer of Classic | ) | |
| Limousine Transportation, LLC, in his | ) | |
| individual capacity, | ) | |
| | ) | |
| Defendants. | ) | |

**BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

I.   <u>Introduction</u>.

This is an action brought by Plaintiff, Anthony M. Blan, an individual who provided chauffeur services to Defendant, Classic Limousine Transportation, LLC ("Classic"), from April 2017 until October 2018.  In the action, Plaintiff asserts claims under the Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. § 201 et seq. ("Count I"), and under the common law doctrine of unjust enrichment ("Count II").  Plaintiff contends that Defendants, Classic, Azur Enterprises, LLC ("Azur Enterprises"), and Classic's President, James Shento ("Shento"), are liable to Plaintiff based on Classic's alleged failure to pay Plaintiff for all of the time that he spent providing chauffeur services to Classic.

Defendants presently move for summary judgment with regard to both of Plaintiff's claims.  Defendants seek summary judgment on the following bases: (1) no genuine issue of material fact exists with regard to Defendants' defense that, even if Plaintiff were an employee and not an independent contractor of Classic's, Plaintiff was a "driver employed by an employer engaged in the business of operating taxicabs," and that he therefore was exempt from the

overtime pay provisions of the FLSA; (2) alternatively, no genuine issue of material fact exists with regard to the defense of Azur Enterprises that it was not an "employer" of Plaintiff's under the FLSA, and that Azur Enterprises therefore cannot be held liable for overtime pay to Plaintiff; (3) no genuine issue of material fact exists with regard to Plaintiff's claim for unjust enrichment; and (4) even if a genuine issue of material fact existed with regard to Plaintiff's unjust enrichment claim against Classic, no genuine issue of material fact exists with regard to Plaintiff's unjust enrichment claim against Azur Enterprises and Shento.

## II.  Concise Statement of Material Facts.

Defendants incorporate herein by reference Defendants' Concise Statement of Material Facts, which Defendants have filed simultaneously with this Brief.

## III.  Summary Judgment Standard.

A motion for summary judgment should be granted where the movant shows that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(a). *See Locke v. Jefferson Hills Mano*r, 2020 WL 2541857, at *2 (W.D. Pa. May 19, 2020) (Horan, J.) ("Pursuant to Federal Rule of Civil Procedure 56, the court must enter summary judgment against a party who fails to make a showing sufficient to establish an element essential to his or her case, and on which he or she will bear the burden of proof at trial.").

A fact is material if it affects the outcome of the suit under the applicable substantive law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party need not produce evidence negating the opponent's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Rather, where the moving party does not bear the burden of proof on the claim, the movant's initial burden of showing the absence of a genuine issue of material fact is met by

260481332.v1

demonstrating a lack of record evidence to support the plaintiff's claim. *Nat'l State Bank v. Fed. Reserve Bank*, 979 F.2d 1579, 1580 (3d Cir. 1992). "A dispute is 'genuine' if the evidence is such that a reasonable trier of fact could render a finding in favor of the nonmoving party." *Razzano v. Sarandrea*, 431 F. Supp. 650, 656–57 (W.D. Pa. 2019) (Horan, J.) (citing *McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005)); *McEachern v. George Junior Republic in Pennsylvania*, 2020 WL 1307421, at *5 (W.D. Pa. Mar. 19, 2020) (Horan, J.).

To defeat a properly-supported motion for summary judgment, the non-moving party "must adduce more than a mere scintilla of evidence in its favor and cannot simply reassert factually unsupported allegations contained in its pleadings." *Williams v. West Chester*, 891 F.2d 458, 460 (3d Cir. 1989) (internal citation omitted). A motion for summary judgment may not be denied based on "mere conjecture or speculation" by the non-moving party. *Desabato v. Assurance Co. of Am.*, 213 F. Supp. 3d 735, 738 (W.D. Pa. 2016) (Cercone, J.) (citing *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382–83 n.12 (3d Cir. 1990)).

Rather, as this Court recently stated: "The mere existence of a factual dispute, however, will not necessarily defeat a motion for summary judgment. Only a dispute over a material fact— that is, a fact that would affect the outcome of the suit under the governing substantive law—will preclude the entry of summary judgment." *Locke*, 2020 WL 2541857, at *2 (Horan, J.). *See also Sypherd Enterprises, Inc. v. Auto-Owners Ins. Co.*, 420 F. Supp. 3d 372, 376 (W.D. Pa. 2019) (Horan, J.) (same); *Razzano v. Sarandrea*, 431 F. Supp. 3d at 656–57 (Horan, J.) (same); *McEachern v. George Junior Republic in Pennsylvania*, 2020 WL 1307421, at *5 (W.D. Pa. Mar. 19, 2020) (Horan, J.) (same).

260481332.v1

IV.   <u>Argument</u>.

    A.   <u>Summary judgment should be entered in favor of Defendants and against Plaintiff on Plaintiff's FLSA claim, because Plaintiff was exempt from the overtime pay requirements of the FLSA pursuant to the FLSA's taxicab exemption, 29 U.S.C. § 213(b)(17), even if Plaintiff were an employee of Classic's.</u>

Under the FLSA, an employer that is covered by the FLSA is required to pay its employees overtime pay, at a rate of not less than 1½ times the regular rate at which the employees are employed, for all hours worked in excess of 40 during a workweek, unless an exemption to the FLSA overtime-pay requirements applies.  29 U.S.C. § 207(a)(1).  The FLSA sets forth an exemption to its overtime-pay requirements for "any driver employed by an employer engaged in the business of operating taxicabs." 29 U.S.C. § 213(b)(17).  The FLSA does not define the terms "taxicabs" or "the business of operating taxicabs."

Courts within the jurisdiction of the United States Court of Appeals for the Third Circuit do not appear to have ruled on the issue of the applicability of the FLSA taxicab exemption to drivers who perform chauffeur services to limousine companies.  The September 2018 decision of the United States Court of Appeals for the Second Circuit in *Munoz-Gonzalez v. D.L.C. Limousine Service, Inc.*, 904 F.3d 208, 218 (2nd Cir. 2018), however, is on point with the facts of this case.  In *Munoz-Gonzalez*, the defendant, D.L.C. Limousine Service, Inc., ("DLC"), operated a chauffeured car service in Westchester County, New York.  The drivers who provided chauffeur services to DLC customers regularly worked more than 40 hours per workweek.  DLC, however, did not pay overtime pay to those drivers.  904 F.3d at 209.

A group of former DLC drivers sued DLC for unpaid overtime pay, under the FLSA. DLC moved for summary judgment.  The United States District Court of the Southern District of New York held that the taxicab exemption applied to DLC's drivers, and the court granted

260481332.v1

summary judgment in DLC's favor on the drivers' FLSA claim. The drivers appealed to the United States Court of Appeals for the Second Circuit. 904 F.3d at 210.

Affirming the trial court's decision, the Second Circuit held that the taxicab exemption to the FLSA's overtime pay requirements applied to DLC's drivers. In arriving at this holding, the court reviewed the facts relevant to the chauffeur services that DLC provides. Those facts are identical to those of the present case, in all material respects. In *Munoz-Gonzalez*, DLC's fleet consisted of five-person cars, SUV's, luxury vans, and mini-coaches. The vehicles were not metered, and did not have "Taxi" or "Vacancy" signs on their roofs. DLC required that its drivers dress professionally in a black suit, white shirt, company tie, black shoes, and black socks. DLC's drivers were not permitted to choose their own jobs or to pick up passengers who hailed the vehicles from the street. DLC's dispatching office assigned drivers to all jobs. DLC's drivers took passengers to wherever they wanted to go, generally relying on in-car navigation systems for directions, unless the customer directed the driver to take a different route. Most trips were within 70 miles, although passengers could book longer trips. Passengers often prepaid their fares before trips began. 904 F.3d at 210-211.

Most of DLC's work came from trips originating at Westchester County Airport, where DLC operated a stand from which vehicles could be dispatched. DLC's contract with the airport required it to list itself as an Airport Transportation Service and as a Limousine Service in the Yellow Pages. The second largest source of DLC's business, next to trips originating from the airport, came from passengers calling DLC's dispatcher to request pickup. DLC received less than 5% of its total business from corporate contracts. For some of DLC's repeat customers, DLC would instruct its drivers to charge certain fixed rates, treat the passengers as VIP's, and keep bottled water and newspapers in the vehicle. 904 F.3d at 211.

In analyzing the applicability of the taxicab exemption to DLC's drivers, the Second

Circuit noted that the FLSA does not define the term "taxicab."  The court stated that, in the

absence of a statutory definition of "taxicab," the court would give the term its ordinary

meaning, starting the court's inquiry with dictionaries and other legal sources that were

contemporaneous with the FLSA's enactment.  In reviewing the definition of "taxicab" in

contemporaneous dictionaries and legal sources, the court identified the following three "crucial

factors" that determine whether a business is in the business of operating taxicabs and whether

the taxicab exemption therefore applies: "(1) a chauffeured passenger vehicle; (2) available for

hire by individual members of the general public; (3) that has no fixed schedule, fixed rate, or

fixed termini."  904 F.3d at 212-214.

The Second Circuit next observed that these three factors for determining "taxicab" status

were consistent with the FLSA's structure.  The court noted that the FLSA exempts employees

throughout the transportation industry.  The court pointed out that transportation employees

generally are FLSA exempt, because the transportation industry is already regulated, and because

applying the FLSA to transportation workers could result in regulatory conflict.  904 F.3d at 215.

With this analysis, the Second Circuit concluded:

> [T]here is no genuine dispute that DLC's drivers qualify for the taxicab
> exemption.  First, DLC's fleet consists of chauffeured passenger vehicles,
> including town cars, SUVs, and luxury vans.  Second, DLC's cars are
> available for hire by individual members of the general public.  Third,
> DLC's cars take passengers wherever they want to go and "do not cover
> fixed routes or adhere to fixed schedules" or fixed termini.

904 F.3d at 216.  The court therefore granted summary judgment in favor of DLC on the drivers'

FLSA overtime pay claim.

At least one federal district court has applied the *Munoz-Gonzalez* rationale in holding

that drivers who provide services to a limousine company are exempt from the overtime pay

260481332.v1

requirements of the FLSA. *See Jihui Zhang v. XYZ Limousine, Inc.*, 2019 WL 1220310 (E.D. N.Y 2019).

The facts of *Munoz-Gonzalez* are indistinguishable from those of the present case in all material respects. The following are the undisputed material facts in this case:

1.      Like DLC, Classic operates a chauffeured car service available for hire by individual members of the general public. ECF 40, p. 9, ¶43; ECF 41, p. 9, ¶43; App. Ex. 1, Tr. 81:3-25, 82:1-8; App. Ex. 2, Tr. 78:3-10; App. Ex. 9; *compare with Munoz-Gonzalez*, 904 F.3d at 214, 216-17.

2.      Classic's fleet, like DLC's fleet, consisted of a variety of vehicles, including sedans, SUV's, luxury vans, and limousines. ECF 40, p. 5, ¶23; ECF 41, p. 5, ¶23; App. Ex. 1, Tr. 211:15-22; App. Ex. 2, Tr. 74:14 to 75:6, 76:15 to 77:1, 84:13 to 89:9; App. Ex. 5; App. Ex. 9; App. Ex. 10; App. Ex. 14, ¶13; *compare with Munoz-Gonzalez*, 904 F.3d at 211, 216.

3.      Classic's vehicles, like DLC's vehicles, are not metered. App. Ex. 2, Tr. 97:17-24; *compare with Munoz-Gonzalez*, 904 F.3d at 211, 213 fn.5.

4.      Like DLC's vehicles, Classic's vehicles do not display taxi or vacancy signs. App. Ex. 1, Tr. 81:14-19; *compare with Munoz-Gonzalez*, 904 F.3d at 211, 219.

5.      Classic's drivers, like DLC's drivers, are required to wear professional attire. ECF 40, p. 3, ¶15; ECF 41, p. 3, ¶15; App. Ex. 1, Tr. 138:9-21; App. Ex. 5; App. Ex. 9; *compare with Munoz-Gonzalez*, 904 F.3d at 211, 219.

6.      Classic's drivers, like DLC's drivers, are not free to choose their own jobs. ECF 40, p. 4, ¶18; ECF 41, p. 4, ¶18; App. Ex. 1, Tr. 81:14-19; App. Ex. 4, Tr. 27:15-19, 42:23-25, 43:1-25, 44:1-24; App. Ex. 5; App. Ex. 13, ¶6; *compare with Munoz-Gonzalez*, 904 F.3d at 211, 219.

7.      Passengers cannot hail Classic's vehicles from the street, just as DLC's drivers are not permitted to do so.  ECF 40, p. 4, ¶18; ECF 41, p. 4, ¶18; App. Ex. 1, Tr. 81:14-19; App. Ex. 4, Tr. 27:15-19; App. Ex. 5; App. Ex. 9; App. Ex. 13, ¶6; *compare with Munoz-Gonzalez*, 904 F.3d at 211, 219.

8.      Like DLC's drivers, Classic's drivers are assigned by the company's dispatching office after providing their availability.  ECF 40, p. 4, ¶18; ECF 41, p. 4, ¶18; Ex. 1, Tr. 146:20 to 156:14; App. Ex. 4, Tr. 27:15-19, 42:23-25, 43:1-25, 44:1-24; App. Ex. 5; App. Ex. 13, ¶6; *compare with Munoz-Gonzalez*, 904 F.3d at 211, 219.

9.      As with DLC's drivers, Classic's drivers take passengers wherever they want to go, relying on their discretion as to what route to take and on navigation systems, unless the customer instructs the driver to take a different route.  App. Ex. 1, Tr. 82:9-25, 83:1-25, 84:1-17, 221:16 to 224:18; App. App. Ex. 9, *see* BLAN 01676; *compare with Munoz-Gonzalez*, 904 F.3d at 216.

10.     As with DLC, most of Classic's trips are local, although clients may book longer trips.  App. Ex. 2, Tr. 132:6-11, 156:9-21; App. Ex. 9; App. Ex. 10; *compare with Munoz-Gonzalez*, 904 F.3d at 211, 217.

11.     Classic's clients, like DLC's clients, may prepay their fares. App. Ex. 1, Tr. 167:20 to 168:12; App. Ex. 4, Tr. 68:12-17; *compare with Munoz-Gonzalez*, 904 F.3d at 211.

12.     Like DLC, Classic considers itself and holds itself out as a limousine service. App. Ex. 2, Tr. 12:11-16, 95:11-12; App. Ex. 9; App. Ex. 10; App. Ex. 12; *compare with Munoz-Gonzalez*, 904 F.3d at 212, 216 fn.8, 219.

As with DLC, Classic maintains some corporate contracts for recurrent transportation. The existence of those corporate contracts, however, does not disqualify Classic from the taxicab

exemption.  As the Second Circuit concluded in *Munoz-Gonzalez*, a taxicab company does not

lose "its essence if it enters into a few corporate contracts[.]"  904 F.3d at 217.  The operative

analysis is not whether corporate contracts exist, but rather "[w]hat matters is that DLC's cars

were available for hire by individual members of the general public, and there is no genuine

dispute that they were."  904 F.3d at 217.

The United States District Court for the Eastern District of New York applied this

rationale in a case that was decided after *Munoz-Gonzalez* and that involved the issue of the

applicability of the taxicab exemption to a limousine company.  In *Jihui Zhang v. XYZ

Limousine, Inc*., 2019 WL 1220310 (E.D. N.Y 2019), the court stated:

> It is also not material to the instant analysis that XYZ [Limousine, Inc.]
> may or may not contract with local businesses for reoccurring
> transportation.  Before the Second Circuit's decision in *Munoz-Gonzalez*,
> courts applying the taxicab exemption relied on the Department of Labor's
> Handbook, which provides that a taxicab company "without . . . contracts
> for recurrent transportation."  [citations omitted].  In *Munoz-Gonzalez*,
> however, the Court clarified that a ground transportation services company
> that has contracts with local businesses for recurrent transportation can
> still be a taxicab company within the meaning of the FLSA so long as the
> company is available for hire by members of the general public.  *Munoz-
> Gonzalez*, 904 F.3d at 217.  . . .  Therefore, so long as a ground
> transportation company is available for hire by the general public,
> contracts for recurrent transportation do not render the taxicab exemption
> inapplicable.

2019 WL 1220310, at *7.  *See also* ECF 50, p. 1 ("The key question in determining the

applicability of the taxicab exemption to this case is the availability of services to individual

members of the public, not the percentage-based test advocated by Plaintiff.").

Classic, in sum, clearly satisfies the three factors that the *Munoz-Gonzalez* court

identified as being "crucial" to the applicability of the taxicab exemption.  904 F.3d at 212-214.

Specifically, Classic is in the business of providing: (1) chauffeured passenger vehicles; (2) that

are available for hire by individual members of the public; and (3) that have no fixed schedule,

fixed route, or fixed termini.  No factors that would disqualify Classic from the exemption apply.

Accordingly, the taxicab exemption set forth in 29 U.S.C. § 213(b)(17) applies, and summary

judgment should be entered in favor of Defendants and against Plaintiff on Plaintiff's FLSA

claim.

> B.    Alternatively, summary judgment should be entered in favor of Azur Enterprises and against Plaintiff on Plaintiff's FLSA claim, because Azur Enterprises was not an "employer" of Plaintiff's under the FLSA.

A basic prerequisite for any FLSA lawsuit is an employment relationship between the

plaintiff and defendant.  *Davis v. Abington Mem'l Hosp.*, 817 F. Supp. 2d 556, 563 (E.D. Pa.

2011).

The FLSA defines the term "employer" to include "any person acting directly or

indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d).  The

FLSA recognizes the concept of "joint employment," pursuant to which two or more entities

may both be "employers" of the same employee or group of employees.  Under the FLSA, a joint

employer relationship exists "[w]here the employers are not completely disassociated with

respect to the employment of a particular employee and may be deemed to share control of the

employee, directly or indirectly, by reason of the fact that one employer controls, is controlled

by, or is under common control with the other employer." 29 C.F.R. § 791.2(b).  "A

determination of whether the employment by the employers is to be considered joint

employment or separate and distinct employment for purposes of the FLSA depends upon all the

facts in the particular case." *Id*. § 791.2(a).

The Third Circuit has established a test, called the "*Enterprise* Test," for determining

whether an entity is a "joint employer" under the FLSA.  Under the *Enterprise* Test, courts

consider:

260481332.v1

1. the alleged employer's authority to hire and fire the relevant employees;

2. the alleged employer's authority to promulgate work rules and assignments and to set the employees' conditions of employment: compensation, benefits, and work schedules, including the rate and method of payment;

3. the alleged employer's involvement in day-to-day employee supervision, including employee discipline; and

4. the alleged employer's actual control of employee records, such as payroll, insurance, or taxes.

*In re Enter. Rent-A-Car*, 683 F.3d at 469-70.

"[I]t is the totality of the circumstances, rather than any particular factor, that governs the determination of whether joint employment exists." *Lepkowski v. Telatron Marketing Grp., Inc.*, 766 F. Supp. 2d 572, 578 (W.D. Pa. 2011) (McLaughlin, J.) (internal quotations and citations omitted). When a legal standard requires the balancing of multiple factors, summary judgment may still be appropriate even if not all of the factors favor one party. *In re Enter. Rent-A-Car*, 683 F.3d at 471 (upholding summary judgment in favor of a parent company because, even though one factor may have been deemed to favor the plaintiffs or may have been found to be neutral, the totality of the circumstances indicated that parent company was not a joint employer); s*ee also Yue Yu v. McGrath*, 597 F. App'x 62, 66 (3d Cir. 2014) (upholding dismissal of the plaintiff's FLSA claim because, although the second and third factors of the *Enterprise* Test weighed partially in the plaintiff's favor, the totality of the circumstances indicated that no reasonable jury could conclude that she was an employee of the defendant under the FLSA); *Moreau v. Air France*, 356 F.3d 942, 952 (9th Cir.2004) (two factors favoring a finding of joint employment do "not outweigh the numerous significant factors . . . which weigh heavily against finding a joint employer relationship," and summary judgment therefore was appropriate).

In *Enterprise*, the Third Circuit agreed with the trial court's conclusion that the parent company, Enterprise Holdings, Inc., was not a joint employer with its subsidiary company pursuant to the FLSA, because the parent company had "no authority to hire or fire assistant managers, no authority to promulgate work rules or assignments, and no authority to set compensation, benefits, schedules, or rates or methods of payment . . . [and] was not involved in employee supervision or employee discipline, nor did it exercise or maintain any control over employee records." *In re Enter. Rent-A-Car*, 683 F.3d at 471.

Here, even if Plaintiff were an employee Classic's, the undisputed facts demonstrate that Azur Enterprises was not an employer of Plaintiff's under the FLSA.   All four factors of the *Enterprise* Test weigh in favor of a finding that Azur Enterprises was not a joint employer of Plaintiff's, and that Azur Enterprises therefore was not an "employer" as contemplated by the FLSA.

First, Azur Enterprises does not have the authority to hire, fire, engage, or disengage employees and independent contractors - this authority is retained exclusively by James Shento, Classic's President.  App. Ex. 1, Tr. 80:2-20, 84:18 to 97:20; App. Ex. 2, Tr. 8:17-19, 11:3 to 12:10, 69:7-18, 71:5 to 72:14, 89:23 to 93:23, 107:21 to 117:18, 119:19 to 121:5, 123:12 to 179:7, 255:16 to 256:19, 275:7-11; App. Ex. 3, Tr. 27:1-25, 79:21 to 83:2, 86:20 to 87:-18; App. Ex. 13, ¶7.  Indeed, it was Shento who retained Plaintiff as an independent contractor on behalf of Classic.  App. Ex. 1, Tr. 90:13-25, 91:1-11, 125:13-25, 126:1-25; App. Ex. 5; App. Ex. 6; App. Ex. 7; App. Ex 11.

Second, all work rules, assignments, and working conditions relative to Classic's employees and independent contractors are established and maintained by Classic.  App. Ex. 1, Tr. 84:18 to 156:14, 196:16-23, 227:21 to 228:16, 231:7-12, 262:7-13; App. Ex. 3, Tr. 27:1-25,

79:21 to 83:2, 87:8-18; App. Ex. 5; App Ex. 6; App. Ex. 7; App. Ex. 11.  This includes drafting, executing, and enforcing all independent contractor agreements, policies, and documents provided to individuals who provide services to Classic.  *Id.*  For example, Shento conducted Plaintiff's onboarding and orientation as an independent contractor with Classic.  This included, *inter alia*, Shento's interviewing Blan, Blan's submitting an independent contractor application and other onboarding documents, Shento's reviewing Classic's independent contractor training materials with Blan, Shento's discussing with Blan the service requirements and remuneration for independent contractors and the independent contractor status of chauffeurs, and Blan's and Shento's executing a Classic independent contractor agreement.  App. Ex. 1, Tr. 90:13-25, 91:1-11, 125:13-25, 126:1-25; App. Ex. 2, 119:19 to 121:5; App. Ex. 5; App. Ex. 6; App. Ex. 7; App. Ex 11.  Shento alone also controls the compensation and remuneration of employees and contractors, and it was Shento who executed the independent contractor agreement with Plaintiff that outlined the terms, including rate and method of payment, of his remuneration.  App. Ex. 1, Tr. 98:1-25, 99:1-23, 115:11-20; App. Ex. 7).  App. Ex. 2, Tr. 262:11 to 263:25; App. Ex. 13, ¶¶9-10.

Third, Shento oversees the day-to-day operations and management of Classic without any involvement from Azur Enterprises.  In Shento's role as President, Shento alone has the authority to hire, fire, engage, disengage, and control the compensation and remuneration of, Classic's employees and independent contractors.  Shento interviews and onboards new chauffeurs, and trains them on Classic's independent contractor procedures.  Shento is responsible for Classic's regulatory compliance, such as compliance with Pennsylvania Public Utility Commission regulations.  App. Ex. 2, Tr. 8:17-19, 11:3 to 12:10, 71:5 to 72:14, 89:23 to 93:23, 107:21 to 117:18, 123:12 to 179:7, 255:16 to 256:19, 275:7-11; App. Ex. 3, Tr. 27:1-25, 79:21 to 83:2,

86:20 to 87:-18; App. Ex. 5; App Ex. 6; App. Ex. 7; App. Ex. 8; App. Ex. 10; App. Ex. 11; App.

Ex. 13, ¶7. Furthermore, Heidi Muzik ("Muzik"), Shento's Administrative Assistant at Classic,

creates the schedules for Classic's chauffeurs, which Shento approves.  App. Ex. 2, Tr. 239:18 to

240:2; 278:18-22; App. Ex. 4, Tr. 6:22 to 7:1; 42:23-25, 43:1-11; 86:19-21; App. Ex. 13, ¶6.

      Finally, Classic maintains its own employee and independent contractor records.  To

compensate Classic's chauffeurs, Muzik prepares and maintains Chauffeur Pay Reports.  App.

Ex. 2, Tr. 57:8-19, 213:10 to 214:3, 220:6-10, 278:11-17; App. Ex. 3, Tr. 69:13-22, 71:21 to

72:24, 73:12 to 75:16; App. Ex. 4, Tr. 66:5-25, 67:1-3.  Classic utilizes the services of Richard

Mansfield ("Mansfield"), an independent contractor of Azur Enterprises, to perform Classic's

accounting services, including payroll. App. Ex. 2, Tr. 57:10-22, 82:3-20; App. Ex. 3, Tr. 6:21 to

8:9, 19:23 to 20:15.  Mansfield does not maintain any payroll records, and instead performs

accounting services for Classic based on Classic's records (provided to him by Muzik), prepares

paychecks, and processes payroll from Classic's bank account.  App. Ex. 2, Tr. 57:10-22, 249:2-

7, 275:12 to 276:18, 278:11-17, App. Ex. 3, Tr. 38:11 to 40:12, 48:3 to 49:25, 53:16 to 58:25,

64:12 to 65:7, 67:16 to 68:4, 69:13-22, 71:21 to 72:24, 73:12 to 75:16; App. Ex. 4, Tr. 67:1-25,

68:1-25, 69:1-23.  Muzik ensures that all paychecks are distributed to Classic's chauffeurs.  App.

Ex. 3, Tr. 73:12 to 75:16; App. Ex. 4, Tr. 70:22-25, 71:1-10.  Mansfield's involvement in

Classic's accounting services is purely administrative, and Classic maintains actual control of its

Chauffeur Pay Reports and payroll records.  App. Ex. 2, Tr. 57:8-19, 213:10 to 214:3, 220:6-10,

278:11-17; App. Ex. 3, Tr. 69:13-22, 71:21 to 72:24, 73:12 to 75:16; App. Ex. 4, Tr. 66:5-25,

67:1-3.  Classic pays Azur Enterprises an accounting services fee for Mansfield's services, and

any payroll or bills processed by Mansfield on behalf of Classic are paid from Classic's bank

accounts.  App. Ex. 3, Tr. 38:11 to 39:19, 41:1-13, 42:25 to 43:17, 48:3 to 49:25, 52:10-24,

53:16 to 56:9, 64:12 to 65:7, 69:11-25, 71: 21 to 73:23, 98:16 to 99:10.  Mansfield is not aware

of any specifics regarding Classic's compensation structure - he simply processes payroll

pursuant to the documents that Classic provides.  App. Ex. 3, Tr 69:11-25, 71: 21 to 73:23, 86:20

to 87:18.  By Mansfield's own account, he has "only known Jim Shento to be the head of

operation" of Classic.  App. Ex. 3, Tr. 83:1-2.

For these reasons, even if Plaintiff were an employee rather than an independent

contractor of Classic's, and even if Plaintiff did not fall within the taxicab exemption to the

overtime pay requirements of the FLSA, summary judgment should be entered in favor of Azur

Enterprises and against Plaintiff with regard to Plaintiff's FLSA claim.

C.    <u>Summary judgment should be entered in favor of Defendants and against
       Plaintiffs on Plaintiff's claim for unjust enrichment.</u>

Count II of Plaintiff's Amended Complaint is a Pennsylvania state law claim against all

three Defendants for unjust enrichment.

As an initial matter with regard to Plaintiff's unjust enrichment claim, the claim is barred

by the existence of a written contract governing the terms of Plaintiff's remuneration.  Under

Pennsylvania law, it is long-settled that "the quasi-contractual doctrine of unjust enrichment is

inapplicable when the relationship between parties is founded on a written agreement or express

contract."  *Braun v. Wal-Mart Stores, Inc.*, 24 A.3d 875, 896 (Pa. Super. Ct. 2011), *aff'd*, 106

A.3d 656 (Pa. 2014) (quoting *Schott v. Westinghouse Elec. Corp.*, 259 A.2d 443, 448 (Pa.

1969)).  *Accord Pro-Spec Corp. v. Chester Water Auth.*, 2017 WL 2797897, at *6 (E.D. Pa. June

28, 2017) (The "doctrine of unjust enrichment is inapplicable when the relationship between

parties is founded on a written agreement or express contract."); *Gottselig v. Energy Corp. of

Am.*, 2015 WL 5820771, at *7 (W.D. Pa. Oct. 5, 2015) ("Pennsylvania has long ascribed to the

rule that when the parties' relationship is based on an express written contract no unjust enrichment recovery is permitted.") (internal quotations omitted) (Mitchell, J.).

There is no issue of material fact with regard to the existence of a written contract which governs the relationship between Classic and Plaintiff.  The written agreement between Classic and Plaintiff is an Agreement for Independent Contractor Services and Addendum dated April 14, 2017.  App. Ex. 7.  Plaintiff and Classic entered into this express, written agreement governing Plaintiff's independent contractor relationship before Plaintiff began providing services on behalf of Classic.  App. Ex. 1, Tr. 90:13-25, 91:1-15, 97:12 to 99:23, 107:20 to 115:20, 125:13-25, 126:1-25; App. Ex. 5; App. Ex. 6; App. Ex. 7; App. Ex 11.  Because the relationship between Plaintiff and Classic was founded on a written Agreement for Independent Contractor Services and Addendum, the doctrine of unjust enrichment does not apply in this case.

Moreover, even if the relationship between Plaintiff and Classic were not governed by a written contract, Defendants would be entitled to summary judgment on Plaintiff's unjust enrichment claim.  To prevail on a claim for unjust enrichment, a plaintiff must prove that: (1) benefits were conferred on defendant by plaintiff; (2) appreciation of such benefits by defendant; and (3) acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value.  *Wilson v. Parker*, 227 A.3d 343, 344 (Pa. Super. Ct. 2020); *Sida v. Pintura Constr. LLC*, 2018 WL 6258604, at *4 (W.D. Pa. Nov. 30, 2018) (Hornak, J.).

The "enrichment" that Plaintiff contends that he provided to Defendants was to allegedly have worked more than 40 hours per workweek without having received overtime pay for work in excess of 40 hours per workweek.  *See* ECF 35, ¶¶ 76-78.  As noted in Section IV(A) above,

however, Plaintiff was not entitled to overtime pay under the FLSA.  Furthermore, the

Independent Contractor Agreement between Plaintiff and Classic contains no promise by Classic

to pay him overtime.  Classic thus paid Plaintiff what Classic was legally required to pay

Plaintiff, and what Plaintiff agreed to accept as payment for his services.  Thus, even if there

were no written agreement between Plaintiff and Classic, no genuine issue exists with regard to

the fact that Defendants were not unjustly enriched.

And, even if Plaintiff's unjust enrichment claim were not barred as a result of a written

agreement between Classic and Plaintiff, and even if Plaintiff could somehow show that he

enriched Defendants, the FLSA preempts Plaintiff's unjust enrichment claim.  Third Circuit

Courts have found that the FLSA does not preempt state law claims for violation of wage and

hours statutes, but the court in *Formica v. US Envtl. Inc.* noted that just "[b]ecause [plaintiff's]

claim under Pennsylvania's wage laws is not preempted does not mean that the breach of

contract and unjust enrichment causes of action are not."  2018 WL 3374764, at \*2 (E.D. Pa.

July 11, 2018).  Put another way, "statutory claims are not preempted, but state common law

claims may be."  *Id.*  The court concluded that "duplicative state common law claims are

preempted by the FLSA."  *Id.*

The facts in *Formica* with regard to this issue are analogous to the facts of the present

case.  In *Formica*, like here, "the state law . . . unjust enrichment claim[ ] arise[s] out of the same

core facts as the FLSA claims – the defendant failed to pay the plaintiff at the legal overtime

rate."  *Id.*; *see* ECF 35 ¶¶ 24, 33-35, 41, 76.  Also, as in *Formica*, Plaintiff "need not prove any

more facts to establish his state law claims than he does to prove his FLSA claim."  *Id.*

Plaintiff's unjust enrichment claim is based on the same facts as his FLSA claim.  *Id.* at

\*3; ECF ¶¶ 24, 33-35, 41, 76; *see Gutwirth v. Woodford Cedar Run Wildlife Refuge,* 38 F. Supp.

3d 485, 491 (D.N.J. 2014) ("Plaintiff's unjust enrichment claim merely duplicates the FLSA overtime claim because the same underlying facts and circumstances form the basis of both claims."). Because the FLSA provides a remedy, Plaintiff's his unjust enrichment claim is preempted. *Id.*; *Preobrazhenskaya v. Mercy Hall Infirmary,* 71 F. App'x. 936, 941 (3d Cir. 2003) (affirming dismissal of a plaintiff's common law claim for violation of public policy because there was a statutory remedy under the FLSA and facts underlying both claims were the same), *cert. denied,* 540 U.S. 1150 (2004).

For these reasons, summary judgment should be entered in favor of Defendants and against Plaintiff on Plaintiff's unjust enrichment claim.

D. <u>Even if Plaintiff could maintain a claim against Classic for unjust enrichment under the facts of this case, no genuine issue of material fact exists with regard to the unjust enrichment claim against Azur Enterprises and Shento.</u>

Plaintiff's claim for unjust enrichment against Azur Enterprises and Shento is unsustainable because Plaintiff conferred no benefits on Azur Enterprises or Shento. *See Wilson*, 227 A.3d at 344; *Sida*, 2018 WL 6258604, at *4. Plaintiff has not, and cannot, set forth evidence to create an issue of material fact on this point. App. Ex. 3, Tr. 41:1-13, 42:25 to 43:17, 98:16 to 99:10.

Moreover, with regard to the unjust enrichment claim against Shento, in *Germain v. Wisniewski*, the court reconsidered its prior assumption that "the participation theory of liability can establish individual liability in the context of a claim for unjust enrichment[.]" 2017 WL 168499, at *3 (W.D. Pa. Jan. 17, 2017) (Bissoon, J.). In *Germain*, the court relied on the Third Circuit's reasoning that "[u]nless the corporate officer extends promises in his individual capacity, the participation theory does not apply in the context of an action breach of contract." *Id*. (citing *Walsh v. Alarm Sec. Grp., Inc.*, 95 Fed.Appx. 399, 402 (3d Cir. 2004) (citation and

internal quotation marks omitted)).  The court in *Germain* went on to conclude that individual liability "only applies when a corporate officer commits 'tortious acts, such as fraud[.]'"  *Id*. Relevant to this matter, the *Germain* court dismissed an unjust enrichment claim against an individual defendant, finding: "Here, the unjust enrichment claim is not based on allegations that would amount to a tort.  Rather, the allegations in support of this claim are the same allegations that support Plaintiff's breach of contract claims against [corporate defendants]. [citation omitted].  As a result, the Court concludes that the participation theory does not apply."  *Id*. at *4.

Here, Plaintiff has not alleged that Shento extended any promises to Plaintiff in his individual capacity or that Shento has committed tortious acts in his individual capacity.

For these reasons, even if summary judgment is not entered as to all Defendants on Plaintiff's unjust enrichment claim, the Court should enter summary judgment in favor of Azur Enterprises and James Shento on that claim.

V.   Conclusion.

For the foregoing reasons, Defendants respectfully request that summary judgment be entered in their favor, and against Plaintiff, in the above-captioned case.

Dated:  August 17, 2020                           Respectfully submitted,


                                                  /s/ Kurt A. Miller
                                                  Kurt A. Miller
                                                  Pa. I.D. No. 37850

                                                  Andrew J. Ruxton
                                                  Pa. I. D. 322818

                                                  CLARK HILL PLC
                                                  One Oxford Centre
                                                  301 Grant Street, 14th Floor
                                                  Pittsburgh, PA  15219

Telephone:  (412) 394-2363
Facsimile:  (412) 394-2555

*Attorneys for Defendants, Classic Limousine Transportation, LLC; Azur Enterprises, LLC; and James Shento*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of **BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** has been served, via the Court ECF filing system, this 17th day of August 2020, as follows:

> Edward J. Feinstein
> Elizabeth Rabenold
> Ruairi McDonnell
> Emily Wittlinger
> FEINSTEIN DOYLE PAYNE & KRAVEC, LLC
> Law & Finance Building, Suite 1300
> 429 Fourth Avenue
> Pittsburgh, PA  15219-1639
> efeinstein@fdpklaw.com
> erabenold@fdpklaw.com
> rmcdonnell@fdpklaw.com
> ewittlinger@fdpklaw.com

/s/ Kurt A. Miller
Kurt A. Miller

260481332.v1