**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

ANTHONY M. BLAN,                )
                                     )
           Plaintiff,         )
                                     )  Civil Action No. 19-807
     v.                   )
                                   )  Judge Marilyn J. Horan
CLASSIC LIMOUSINE       )
TRANSPORTATION, LLC and JAMES  )
SHENTO,                    )
                                   )
           Defendants.     )

**OPINION**

Plaintiff Anthony M. Blan brings suit against Defendants Classic Limousine

Transportation, LLC (Classic), Azur Enterprises, LLC (Azur Enterprises), and James Shento,

President of Classic in his individual capacity, alleging claims for violation of the Fair Labor

Standards Act (FLSA) and unjust enrichment relating to alleged unpaid overtime wages for his

work as a chauffeur.  (ECF No. 35).  Following completion of discovery, Mr. Blan filed a Partial

Motion for Summary Judgment, requesting summary judgment as to Count I of his Amended

Complaint for violations of the FLSA.  (ECF No. 55).  The Defendants also filed a Motion for

Summary Judgment requesting that the Court find in its favor on all counts.  (ECF No. 58).  Mr.

Blan's Partial Motion for Summary Judgment will be granted and the Defendants' Motion for

Summary Judgment will be denied regarding Mr. Blan's classification as an employee and

whether Classic falls under the taxicab exemption of the FLSA.  Mr. Blan's Partial Motion for

Summary Judgment on Classic's good faith affirmative defense will be denied.  Defendants'

Motion for Summary Judgment on the issue of whether Azur Enterprises is a joint employer

1

under the FLSA is granted.  Defendants' Motion for Summary Judgment on the issue of unjust

enrichment is granted.

I.      **Background**

Mr. Blan worked as a chauffeur for Classic Limousine from April 2017 through October

2018.  (ECF No. 56, ⁋⁋ 111-12).  Classic provides limousine and shuttle services throughout the

Pittsburgh area, although passengers can book longer trips as well.  (ECF No. 60, ⁋ 26).  Classic

has a fleet of fifteen vehicles, including a combination of sedans, stretch limousines, passenger

vans, and a limousine bus.  (ECF No. 56, ⁋⁋ 140-149).  Six of the vehicles in Classic's fleet carry

eleven passengers or more.  (ECF No. 56, ⁋⁋ 140, 142, 143, 145, 149).

All of Classic's vehicles are unmetered and none of the vehicles display taxi or vacancy

signs.  (ECF No. 56, ⁋ 132, 133).  Passengers cannot hail Classic vehicles from the street.  (ECF

No. 56, ⁋ 135).  The President of Classic, Mr. Shento testified that Classic "is not a taxi

company," nor does Classic advertise itself as a taxi service.  (ECF No. 56, ⁋⁋ 124, 138).  Classic

is not authorized by Pennsylvania Public Utility Commission to operate taxicabs.  (ECF No. 56,

⁋ 129).  Instead, it is authorized to provide limousine, broker of passengers, and paratransit

services.  (ECF No. 56, ⁋ 10).

Generally, Classic's drivers take passengers wherever they want to go; they do not cover

fixed routes or adhere to fixed schedules.  (ECF No. 60, ⁋ 25).  However, Classic provides at

least three different "shuttle" services in which its drivers adhere to a fixed route or fixed

schedule.  (ECF No. 63, ⁋ 25).  Classic provides shuttle service around downtown Pittsburgh for

the workers at Gateway Center from 8 am to 2 pm Monday through Friday.  (ECF No. 56, ⁋⁋

150-155).  Mr. Shento estimated that about 10% of Classic's revenue is derived from this

contract.  (ECF No. 56, ⁋ 156).  Classic operates a shuttle for Aramark employees during home

football games at Heinz Field.  (ECF No. 56, ¶¶ 158-163).  Classic also provides shuttle services

for DDI Shuttle on a fixed schedule.  (ECF No. 56, ¶¶ 180-84).  Classic also has a contract with

the BLS Limousine Service in New York. (ECF No. 56, ¶¶ 164-166).  Mr. Shento estimated that

between 5-10% of Classic's business is derived from this contract.  (ECF No. 56, ¶ 167).  Classic

has a contract with Boston Coach, which generates about 15% of Classic's revenue.  (ECF No.

56, ¶ 169-70).  Mr. Shento estimated that about 20% of Classic's revenue comes from other

limousine companies.  (ECF No. 56, ¶¶ 169-174).  Mr. Shento estimated that about 35-40% of

Classic's business comes from recurrent contracts.  Although Classic has recurrent business with

corporate clients, it does not have written agreements with the majority of these clients. (ECF

No. 63, ¶ 25).  As a Classic chauffeur, Mr. Blan made 1,422 trips of which 497, or 35%, were

from Classic's recurrent contracts.  (ECF No. 56, ¶ 201).

When Mr. Blan started working at Classic, he was provided with a policy and procedure

document outlining his job duties.  (ECF No. 56, ¶ 35).  This document explicitly stated that

there is "No Guarantee of hours each day/week."  (ECF No. 56, ¶ 35).  The drivers were

expected to provide Classic dispatch with their availability for scheduling, after which Classic

dispatch exclusively established work schedules and duty assignments for the drivers on a

weekly basis.  (ECF No. 56-4, 5).  The drivers were expected to follow Classic's uniform

requirements, and they could only use Classic vehicles when driving passengers for Classic.

(ECF No. 56, ¶¶ 36-37, 49).

Classic's Dispatch processed all passenger reservations and distributed daily Reservation

Tickets with instructions for the chauffers' assignments.  (ECF No. 56, ¶ 52).  The chauffeurs

were not permitted to trade assigned trips with other chauffeurs without prior approval of

Classic's dispatch.  (ECF No. 56, ¶ 70).  Additionally, chauffeurs were not permitted to schedule

trips for Classic's passengers without involving Classic's dispatch.  (ECF No. 56, ⁋ 72).

Chauffeurs were not free to choose their own jobs.  (ECF No. 56, ⁋ 84).

Classic chauffeurs were paid an hourly rate of $5.50 per hour plus 18% of each transport fee.  (ECF No. 56, ⁋ 85).  When he was initially hired, Mr. Blan signed an employment agreement for Independent Contractor Services with Classic.  (ECF No. 60, ⁋ 49).  At the time, Mr. Shento told Mr. Blan that he would be classified as an independent contractor due to a "loophole."  (ECF No. 56, ⁋ 212).  There is a factual dispute over whether Mr. Shento told Mr. Blan that he would not receive time and a half for any hours worked above 40 hours per week. (ECF No. 60, ⁋⁋ 49-50; ECF No. 63, ⁋⁋ 49-50).  When Mr. Blan started with Classic, Mr. Shento also informed him that he would "prefer" that he would not work for another limousine company.  (ECF No. 56, ⁋ 95).  Classic was Mr. Blan's only employer during the time period for which he worked for Classic.  (ECF No. 56, ⁋ 123).

Classic provided all of the equipment and materials for the drivers.  (ECF No. 56, ⁋⁋ 97, 98, 100, 101, 102, 103, 105, 106).  Classic paid for car insurance, car maintenance, fuel, carwashes, tolls, alcohol, soft drinks, and car seats.  (ECF No. 56, ⁋⁋ 97, 98, 100, 101, 102, 103, 105, 106).  Mr. Blan worked for Classic for about a year and a half from April 17, 2017 to October 2, 2018.  (ECF No. 56, ⁋⁋ 111, 112).

Azur Enterprises is the sole member of Classic.  (ECF No. 56, ⁋ 12).  Classic's bank accounts are separate from Azur Enterprises, but Classic's taxes are filed through Azur Enterprises.  (ECF No. 60, ⁋ 60, No. 63, ⁋ 49).  Classic is considered a "disregarded entity" for tax purposes.  (ECF No. 60, ⁋ 9).  Classic's income accounts for a third of Azur Enterprises' total income.  (ECF No. 63, ⁋ 50).

Mr. Francis Azur and his wife and son are the owners of Azur Enterprises.  (ECF No. 60, ⁋ 3).  As the President of Classic, Mr. Shento reports to Mr. Azur.  (ECF No. 63, ⁋ 33).  Mr. Mansfield, an independent contractor who performs accounting services for Azur Enterprises, also works on Classic's payroll, bills, and paychecks.  (ECF No. 60, ⁋ 38).  Classic reimburses Azur Enterprises for Mr. Mansfield's accounting fees for services provided to Classic.  (ECF No. 60, ⁋ 45).  Mr. Mansfield and Mr. Azur are the only persons authorized to transfer funds from Classic's bank account.  (ECF No. 63, ⁋ 47).  Mr. Azur has made personal loans to Classic, but Azur Enterprises has never transferred funds to Classic.  (ECF No. 60, ⁋ 36).  Azur Enterprises holds the title to some of the vehicles in Classic's fleet and Classic holds the title to the rest of the vehicles in its fleet.  (ECF No. 63, ⁋ 51). Classic does not currently have sufficient cash to satisfy either the vehicle loan it owes Mr. Azur or the balance of its line of credit owed to Azur Enterprises.  (ECF No. 63, ⁋ 61).  Members of Azur Enterprises work in Azur Enterprises' own corporate offices; none are physically present at Classic's garage.  (ECF No. 60, ⁋ 39).  Classic's employees are eligible for group health insurance, life insurance, dental insurance, and accidental death and dismemberment coverage through Azur Enterprises.  (ECF No. 63, ⁋⁋ 42, 43).

Five issues must be considered to resolve these two Motions for Summary Judgment. First, was Mr. Blan an employee or an independent contractor for purposes of the FLSA? Second, if Mr. Blan was an employee, does the FLSA taxicab exemption apply to Classic? Third, if Classic violated the FLSA by not paying overtime wages, was such non-payment done in good faith?  Fourth, was Azur Enterprises a joint employer for purposes of the FLSA?  Fifth, are any of the Defendants liable to Mr. Blan for unjust enrichment?

## II.      Legal Standard

According to Federal Rule of Civil Procedure 56, a court must grant summary judgment where the moving party "shows that there is no genuine dispute as to any material fact" and the moving party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  For a dispute to be genuine, there must be "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party." *Moody v. Atl. City Bd. Of Educ.*, 870 F.3d 206, 213 (3d Cir. 2017) (internal quotations omitted).  Additionally, for a factual dispute to be material, it must have an effect on the outcome of the suit. *Id.*

In reviewing and evaluating the evidence to rule upon a motion for summary judgment, the court must "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the" non-moving party. *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014) (internal quotations omitted).  However, where "the non-moving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,'" the moving party is entitled to judgment as a matter of law.  *Moody*, 870 F.3d at 213 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

## III.     Discussion

### a.  Whether Mr. Blan Is Classified as an Employee or Independent Contractor

"Under Section 7(a) of the FLSA, employees are generally required to be paid overtime for all hours worked in excess of 40 hours per week." *Crespo v. Kismet Exec. Limousine Serv., Inc.*, 15-5706, 2018 WL 3599738, at *3 (D.N.J. July 27, 2018).  Third Circuit courts follow a six- factor test to determine whether a person is considered an employee under the FLSA:

> (1) the degree of the alleged employer's right to control the manner in which the work is to be performed;
> (2) the worker's opportunity for profit or loss depending on his managerial skill;

(3) the worker's investment in equipment or materials required for his task, or his employment of helpers;
(4) whether the service rendered requires a special skill;
(5) the degree of permanence of the working relationship; and
(6) whether the service rendered is an integral part of the alleged employer's business.

*Id.* (citing *Martin v. Selker Bros. Inc.*, 949 F.2d 1286, 1293 (3d Cir. 1991)). "Neither the presence nor the absence of any particular factor is dispositive; rather the determination of whether the economic realities indicates an employer-employee relationship must be based on the 'circumstances of the whole activity.'" *Id.* (quoting *Martin*, 949 at 1293). Mr. Blan argues that he is an employee for the purposes of the FLSA and is therefore entitled to overtime payment. (ECF No. 57, 2). The Defendants argue that Mr. Blan was properly classified as an independent contractor such that the FLSA's overtime requirements do not apply. (ECF No. 65, 13). Each of these six factors will be analyzed in turn.

"Under the first factor, 'courts should consider the degree of supervision over the worker, the control over the worker's schedule, and instruction as to how the worker is to perform his duties.'" *Id.* (quoting *Zanes v. Flagship Resort Dev., LLC*, No. 09-3736, 2012 WL 589556, at *5 (D.N.J. Feb. 22, 2012)). Mr. Blan argues that Classic had significant control over the manner in which his work was to be performed. (ECF No. 57, 2). Defendants argue that Mr. Blan had relative autonomy in his position and that Classic had only limited control over the manner in which his work was to be performed. (ECF No. 65, 15). Here, Classic had significant control over how Mr. Blan would complete his duties. Classic required chauffeurs to perform in accordance with Classic's detailed written instructions. Classic established and distributed weekly schedules and made daily work assignments. Classic chauffeurs had to comply with Classic's detailed uniform requirements. Further, Classic closely controlled many aspects of the

job, including how chauffeurs were to behave towards guests and what they were to do if a guest was late or canceled.  Additionally, all trips were arranged only through Classic's dispatch, and chauffeurs were not free to choose their own jobs.  Chauffeurs were not permitted to schedule passengers or pick up passengers who did not have a Reservation Ticket from Classic dispatch. In these respects, Classic clearly exercised significant control over Mr. Blan.  Thus, this factor weighs in favor of finding Mr. Blan was an employee rather than an independent contractor.

"The second factor considers whether Plaintiffs 'faced a real opportunity for either a profit or loss in their operations, depending upon the amount of their investment and their skills in management.'"  *Id.* at 4 (quoting *Donovan v. DialAmerica Mktg., Inc.*, 757 F.2d 1376, 1387 (3d Cir. 1985)).  "Courts examine 'whether the worker's income depends on factors beyond his control or whether it is impacted by the worker's managerial skills.'"  *Id.* (quoting *Zanes*, 2012 WL 589556, at *6)).  Mr. Blan argues that chauffeurs were not free to select their own jobs and that their pay was controlled by Classic.  (ECF No. 57, 8).  Defendants argue that chauffeurs controlled their opportunity for profit because they could decide the times for which they would be available for Classic dispatch to schedule them for work.  (ECF No. 65, 20).  Although the chauffeurs submitted their availability for scheduling each week, Classic dispatch solely determined the work schedules and assignments.  The Chauffeur Training Outline, which was given to all newly hired Classic chauffeurs, advised drivers that Classic made "No Guarantee of hours each day/week."  (ECF No. 56, ⁋ 35).  Classic chauffeurs are not paid a fixed weekly rate. Mr. Blan was paid $5.50 per hour plus 18% of the fee Classic charged for each of his assigned trips.  Classic controlled the scheduling and assignments and thus determined the extent of Mr. Blan's earning ability notwithstanding the schedule of times when he told Classic dispatch he would be available for work.  Because Classic, not Mr. Blan, ultimately controlled his actual

earnings, this factor weighs in favor of finding Mr. Blan was an employee rather than an independent contractor.

"The third factor considers 'the alleged employee's investment in equipment or material required for his task or his employment of helpers.'" *Id.* (quoting *Zavala v. Wal-Mart Stores*, 393 F. Supp. 2d 295, 328 (D.N.J. 2005)).  Mr. Blan argues that Classic provided all car and materials, so his investment in materials was limited.  (ECF No. 57, 9).  Defendants do not address this argument in their briefings.  Classic paid for car insurance, car maintenance, fuel, carwashes, tolls, alcohol, soft drinks, and car seats.  There are no allegations that the chauffeurs paid any trip-related expenses.  In fact, when drivers personally paid for fuel, carwashes, tolls, alcohol, or soft drinks, Classic reimbursed them for those expenses.  Chauffeurs were responsible to provide their own clothing in accordance with Classic's prescription for uniformity.  Such expense, however, was minimal on the whole.  Therefore, chauffeurs' investment in materials to perform their duties was miniscule in comparison to what Classic provided.  Thus, this factor weighs in favor of finding that Mr. Blan was an employee rather than an independent contractor.

"The Court next considers whether the services rendered by Plaintiffs require a special skill." *Id.*  "It is generally accepted that 'driving' is not itself a 'special skill.'" *Razak v. Uber Techs., Inc.*, 951 F.3d 137, 147 (3d Cir. 2020) (quoting *Alexander v. FedEx Ground Package Sys., Inc.*, 765 F.3d 981, 995 (9th Cir. 2014)).  Mr. Blan argues that driving a limousine is not a special skill.  (ECF No. 57, 10).  Defendants do not address this argument in their briefings.  Because driving is not a special skill, and in the absence of any evidence that driving for Classic required any unique skills, this factor clearly weighs in favor of finding that Mr. Blan was an employee rather than an independent contractor.

"When addressing the degree of permanence of the working relationship, 'courts should consider the exclusivity, length, and continuity of the relationship.'" *Id.* (quoting *Zanes*, 2012 WL 589556, at *6)). Mr. Blan argues this was a permanent working relationship. (ECF No. 57, 10). Defendants argue this was not a permanent relationship because he only worked for two years and his contract with Classic was not exclusive. (ECF No. 65, 21). Mr. Blan worked for Classic for about a year and a half from April 17, 2017 to October 2, 2018. Although Mr. Blan did not sign an exclusivity agreement, Classic's President Mr. Shento told Mr. Blan that he would "prefer" that he only chauffeured for Classic. (ECF No. 56, ⁋ 95). While Mr. Blan could have worked for another limousine company, he only worked for Classic during his employment with Classic. These facts suggest a permanent working relationship. As such, this factor also weighs in favor of finding that Mr. Blan was an employee rather than an independent contractor.

"Finally, the Court must determine whether Plaintiff's services are an integral part of Defendant's business. 'The critical question in assessing the integral relationship factor is the nature of the work performed by the workers: does that work constitute an 'essential part' of the alleged employer's business?'" *Id.* at 5 (quoting *Martin*, 949 F.2d at 1295-96)). "[R]egardless of the amount of work done, workers are more likely to be 'employees' under the FLSA if they perform the primary work of the alleged employer." *Martin*, 949 F.2d at 1296. Mr. Blan argues that chauffeurs are an integral part of a limousine company's business. (ECF No. 57, 11). Defendants do not address this argument in their briefings. Mr. Blan's work as a chauffeur with a limousine company is clearly an integral part of Classic's business. Thus, this factor weighs in favor of finding that Mr. Blan was an employee rather than an independent contractor.

Considering all these factors, it is clear that Mr. Blan was an employee of Classic and not an independent contractor. "Under Section 7(a) of the FLSA, employees are generally required

to be paid overtime for all hours worked in excess of 40 hours per week." *Crespo*, 2018 WL 3599738, at *3.  Mr. Blan qualifies as an employee under FLSA to claim consideration for overtime pay.  Thus, Mr. Blan's Motion for Summary Judgment on the issue of his classification as an employee for the purposes of the FLSA will be granted.

### b.  Whether Classic Qualifies for the Taxicab Exemption

While the FLSA requires that employers pay covered employees a minimum wage as well as overtime pay, Section 213(b) exempts certain categories of employees from receiving overtime pay.  *Chao v. Barker Bros., Inc.*, No. 04-1764, 2005 WL 8174446, at *8 (W.D. Pa. Nov. 22, 2005).  The FLSA's taxicab exemption exempts any employee engaged in the business of operating taxicabs from FLSA's overtime pay requirements.  *Id.*  "Neither the FLSA nor its corresponding regulations define the phrase 'business of operating taxicabs.'"  *Id.* at *9.

The Wage & Hour Division of the Department of Labor has published a Field Operations Handbook, which provides guidance for the taxicab exemption:

> The taxicab business consists normally of common carrier transportation in small motor vehicles of persons and such property as they may carry with them to any requested destination in the community. The business operates without fixed routes or contracts for recurrent transportation. It serves the miscellaneous and predominately local transportation need of the community. It may include such occasional and unscheduled trips to or from transportation terminals as the individual passengers may request, and may include stands at the transportation terminals as well as at other places where numerous demands for taxicab transportation may be expected.

U.S. Dep't of Labor, Wage & Hour Div., Field Operations Handbook 24h01 (1974).  The Handbook also directs that an "airport limousine service" does not qualify under the taxicab exemption.  *Id.* at 24h03(a)(4).  The Department of Transportation's Federal Motor Carrier Safety Administration has explained in its guidance to 49 C.F.R. § 387.27 that "[l]imousines are not taxi cabs and are therefore not exempted from the financial

responsibility requirements."  U.S. Dep't of Transp., Fed. Motor Carrier Safety Admin.,

Guidance to 49 C.F.R. § 387.27.  A different section of the federal code provides a

similar exemption for "a motor vehicle providing taxicab service" to exempt such

vehicles from the jurisdiction of the Surface Transportation Board.  49 U.S.C. § 13506.

Said statute defines "taxicab service" as:

> passenger transportation in a motor vehicle having a capacity of not more than 8 passengers (including the driver), not operated on a regular route or between specified places, and that—
>
> > (A) Is licensed as a taxicab by a State or a local jurisdiction; or
> >
> > (B) Is offered by a person that—
> > > (i)  Provides local transportation for a fare determined (except with respect to transportation to or from airports) primarily on the basis of the distance traveled; and
> > > (ii) Does not primarily provide transportation to or from airports.

*Id.*  Although none of these federal resources are binding upon this Court, these definitions

provide persuasive guidance towards consideration of the FLSA taxicab exemption.

The FLSA taxicab exemption has been addressed by various circuit courts of appeals,

although it has not been addressed by the Third Circuit Court of Appeals.  In 1952, the Fourth

Circuit Court of Appeals considered the taxicab exemption in *Airlines Transportation, Inc. v.*

*Tobin*, 198 F.2d 249 (4th Cir. 1952).  That case involved limousines that provided passenger

transportation pursuant to contracts with three airlines at the Raleigh-Durham Airport.  *Id.* at

250.  The Fourth Circuit Court of Appeals held that the limousines were not taxicabs and they

did not qualify for the taxicab exemption because

> [t]he limousines in transporting passengers to and from the airport are required to follow and may not depart from fixed and limited routes on a definite schedule between beginning and ending points which are fixed in advance without reference to the convenience of a particular passenger; and the arrangement is made under a contract with interstate air carriers to facilitate their interstate business.

12

*Id.* at 252.

In 1967, the Sixth Circuit Court of Appeals similarly found that airport sedans operating out of the Cincinnati Airport did not fall under the taxicab exemption in *Wirtz v. Cincinnati, Newport & Covington Transportation Co*, 375 F.2d 513 (6th Cir. 1967) (per curiam).  The Sixth Circuit Court of Appeals explained that the sedans "are used for the sole purpose of providing group transportation to and from the airport and their use by the general public is restricted to those traveling to and from the said airport.  The Red Tops are unmetered, do not have vacancy signs and are not advertised as taxicabs."  *Id.* at 514.  A taxicab exemption test has evolved through district court decisions based upon this language from *Wirtz*.  *See, e.g.*, *Crespo v. Kismet Executive Limousine Service, Inc.*, 15-5706, 2018 WL 3599738, at *5 n.6 (D.N.J. July 27, 2018) ("The Taxicab Exemption is inapplicable because the record demonstrates that Defendants operated a limousine service rather than a taxi business-drivers were not permitted to cruise for passengers, transportation was prearranged, and fares were determined in advance."); *Rossi v. Associated Limousine Services, Inc.*, 438 F. Supp. 2d 1354, 1363 (S.D. Fla. July 5, 2006) (holding the same and collecting cases).

In 2018, the Second Circuit Court of Appeals found that a limousine service qualified for the taxicab exemption.  *Munoz-Gonzalez v. D.L.C. Limousine Serv., Inc.*, 904 F.3d 208, 210 (2d Cir. 2018).  In that case, the *Munoz-Gonzalez* court created a three-part test for defining a taxicab for the purposes of the FLSA.  Pursuant to *Munoz-Gonzalez*, a taxicab is: "(1) a chauffeured passenger vehicle; (2) available for hire by individual members of the general public; (3) that has no fixed schedule, fixed route, or fixed termini."  *Id.*  The court noted, however, less than 5% of the limousine company's business was from recurrent contracts.  *Id.* at 217.

In 2005, the United States District Court for the Western District of Pennsylvania did not apply the taxicab exemption for a paratransit service for handicapped individuals. *Chao v. Barker Bros., Inc.*, 04-1764, 2005 WL 8174446, at *11 (W.D. Pa. Nov. 22, 2005). The *Chao* court found the following factors relevant to the question of the taxicab exemption:

1. The size and ultimate destination of the vehicle
2. Whether the vehicle follows a fixed route
3. Whether it serves the miscellaneous and predominately local transportation needs of the community
4. How it charges for milage
5. Whether it is licensed to operate call-or-demand
6. Whether it is licensed to operate airport transportation services
7. Whether the vehicles have meters or light domes
8. Whether the vehicles operate from taxi stands
9. Whether drivers are permitted to receive tips
10. Whether drivers have a schedule prepared for them and if changes need to be approved through dispatch
11. How the company advertises its service
12. Whether there are contracts for recurrent transportation
13. Whether it makes occasional trips to the airport
14. Whether more than one passenger is typically transported at a time.

*See id.*

Mr. Blan argues that Classic is a limousine rather than a taxicab company, so the FLSA's taxicab exemption does not apply.  (ECF No. 57, 12).  Classic argues that its business qualifies under the FLSA taxicab exemption, such that it is not required to pay overtime wages to its chauffeurs.  (ECF No. 65, 5).  Although Classic's business has some features of a taxicab service, upon weighing all of the evidence, Classic does not qualify for the taxicab exemption and it was required to pay Mr. Blan overtime.  Although there are some factual similarities to the *Munoz-Gonzalez* case, many distinguishing facts weigh in favor of finding that Classic, on the whole, is not in the business of operating taxicabs.  Classic's business has distinct features that differentiate it from a taxicab business.  Although Classic's limousines predominately serves the local community and do not generally follow fixed routes, a non-negligible portion of Classic's

business does follow fixed routes.  Classic operates and Mr. Blan occasionally drove for

Classic's three contract shuttle services throughout the Pittsburgh area.  Additionally, a large

percentage of Classic's business comes from recurrent contracts.  Further, Classic is not

authorized to by the Pennsylvania Public Utility Commission to drive a taxicab.  It does not

advertise itself as a taxicab company.  Its vehicles are unmetered and do not have vacancy signs.

Also, at least six of the vehicles within Classic's fifteen vehicle fleet carry more than eight

passengers, which puts a large portion of its fleet outside the definition of taxicab, under 49

U.S.C. § 13506.  Classic Dispatch assigns drivers' schedules and trips.  Transportation services

are generally reserved in advance by passengers.  Drivers are not authorized to pick up

passengers on demand or trade trips with other drivers without involving Classic's dispatch.

These facts do not support that Classic qualifies for the FLSA taxicab exemption, even under the

Second Circuit's *Munoz-Gonzalez* test.  As such, Classic is not a taxicab business; therefore, it

does not qualify for the FLSA taxicab exemption.  Mr. Blan was entitled to overtime pay.

Because there is no question of fact as to the amount of overtime wages at issue, $2,575.98 is

owed to Mr. Blan for excess hours he worked while in Classic's employ.  Thus, Mr. Blan's

Motion for Summary Judgment as to the issue of the taxicab exemption will be granted.  The

Defendants' Motion for Summary Judgment as to the issue of the taxicab exemption will be

denied.

### c.  Defendants' Good Faith Defense

Any employer who violates the FLSA overtime requirements is liable to the employee in

the amount of the unpaid overtime as well as "an additional equal amount as liquidated

damages."  29 U.S.C. § 216(b).  Liquidated damages are mandatory under the statute unless the

employer can establish both the good faith and reasonableness of its failure to pay overtime

wages.  *Brooks v. Village of Ridgefield Park*, 185 F.3d 130, 137 (3d Cir. 1999).  Indeed,

"[d]ouble damages are the norm, single damages the exception."  *Solis v. A-1 Mortg. Corp.*, 934

F. Supp. 2d 778, 814 (W.D. Pa. 2013).  If, however, the employer shows that such violation was

done in good faith, then the employer is not liable to the employee for liquidated damages.  29

U.S.C. § 260.  The FLSA good faith defense has both a subjective and objective component.

*William v. Tri-County Growers, Inc.*, 747 F.2d 121, 129 (3d Cir. 1984).  The good faith inquiry

is subjective, which "requires that the employer have an honest intention to ascertain and follow

the dictates of the Act."  *Id.* (quoting *Marshall v. Brunner*, 668 F.2d 748, 753 (3d Cir. 1982)).

The reasonableness inquiry "imposes an objective standard by which to judge the employer's

conduct."  *Id.* (citing *Marshall*, 668 F.2d at 753)).

     Mr. Blan argues that Classic does not meet the good faith standard because it did not take

sufficient actions to meet the good faith requirement.  (ECF No. 57, 23).  The Defendants, on the

other hand, argue that Classic took affirmative steps to ensure compliance with the FLSA, and

that Classic believed that it complied with the FLSA.  (ECF No. 65, 26).  Mr. Blan argues that

Classic did not take enough affirmative steps to assure it complied because it did not consult with

an attorney about the propriety of classifying its chauffeurs as independent contractors and

because it could not produce documentation concerning its FLSA compliance.  (ECF No. 57,

23).  The Defendants cite several historical experiences to support its good faith and

reasonableness in classifying its drivers as independent contractors.  During the 1990's, Classic

was investigated by the state for classifying drivers as independent contractors.  Upon consulting

with other local limousine companies and determining that their drivers were also classified as

independent contractors, the state ceased its investigation.  (ECF No. 65, 26).  Additionally, the

Defendants cite a 2010 state unemployment compensation decision that approved Classic's

designation of its driver as an independent contractor, where the driver argued that he should have been classified as an employee.  (ECF No. 65, 27).  Classic maintains that, because such other government agencies approved its chauffeurs as independent contractors, its belief and actions in this case were both reasonable and in good faith compliance with the FLSA.  (ECF No. 65, 27).  Thus, the Defendants argue that any failure to pay Mr. Blan overtime wages does not require any payment of liquidated damages.  Although the good faith defense is a subjective inquiry, Classic has presented enough evidence to meet the standard of proving that they made a good faith attempt to comply with the FLSA.  There is no question of material fact as to such issue.  Thus, because Classic acted under the reasonable belief that it complied with the FLSA, Classic meets the standards of the good faith defense and is not liable to Mr. Blan for liquidated damages under the FLSA.  Accordingly, Mr. Blan's Motion for Summary Judgment seeking liquidated damages will be denied.

### d.  Azur Enterprises as Joint Employer Under FLSA

"Employer" is defined under the FLSA to mean "any person acting directly or indirectly in the interest of an employer in relation to an employee."  29 U.S.C. § 203(d).  The FLSA recognizes a joint employer relationship where the employers are deemed to share control over the employee.  29 C.F.R. § 791.2(b).  The Third Circuit uses the *Enterprise* Test for determining whether an entity is a joint employer under the FLSA. The four factors include:

1. The alleged employer's authority to hire and fire the relevant employees;
2. The alleged employer's authority to promulgate work rules and assignments and to set the employees' conditions of employment: compensation, benefits, and work schedules, including the rate and method of payment;
3. The alleged employer's involvement in day-to-day employee supervision, including employee discipline; and
4. The alleged employer's actual control of employee records, such as payroll, insurance, or taxes.

*In re Enterprises Rent-A-Car*, 683 F.3d 462, 469-70 (3d Cir. 2012).

Mr. Blan argues that genuine issues of material fact exist regarding whether Azur Enterprises is a joint employer under the FLSA. (ECF No. 62, 5). Azur Enterprises argues that it is not an employer for the purposes of the FLSA because it lacks the control over Classic's daily business, and it does not have the ability to hire or fire Classic's employees. (ECF No. 59, 12). Mr. Blan argues that Mr. Mansfield's deposition testimony creates questions of material fact concerning the degree of control that Mr. Azur has over Classic's daily operations. Mr. Shento's testimony supports the fact that he in fact controls the daily operations of Classic. As the president of Classic, Mr. Shento has the authority to hire and fire Classic chauffeurs, promulgate work rules and assignments, and is in charge of daily supervision and discipline. Testimony that Mr. Francis Azur monitors Classic's operations and consults with Mr. Shento is consistent with his role as president of Azur Enterprises, the sole member of Classic. Such evidence is not sufficient to establish any question of fact regarding the *Enterprise* factors. Testimony by Mr. Mansfield, who is paid by Azur Enterprises and conducts accounting work for Classic, does not establish Azur Enterprises as controlling payroll, insurance, or taxes of Classic. Classic pays Azur Enterprises for the accounting services Mr. Mansfield performs for Classic. A Classic employee prepares Classic's payroll and maintains those records, while Mr. Mansfield merely prepares the paychecks and processes payroll from Classic's bank account. Classic maintains control over its separate business affairs, records, finances, payroll, and employee policies and procedures. Although one-third of Azur Enterprise's income comes from Classic's profits, such is not dispositive of the joint employer question. Upon weighing the four *Enterprise* factors, there are no questions of material fact concerning whether Azur Enterprises is a joint employer under the FLSA. Accordingly, Mr. Blan's Motion for Summary Judgment

against Azur Enterprises as a joint employer will be denied.  Further, Azur Enterprises' Motion

for Summary Judgment as to Mr. Blan's FLSA claim at Count I will be granted.

### e.  Unjust Enrichment Claim

"Unjust enrichment is an equitable remedy, defined as the retention of a benefit conferred

by another, without offering compensation, in circumstances where compensation is reasonably

expected, and for which the beneficiary must make restitution." *Commonwealth by Shapiro v.*

*Golden Gate National Senior Care LLC*, 194 A.3d 1010, 1034 (Pa. 2018).  "The elements of

unjust enrichment are (1) benefits conferred on defendant by plaintiff, (2) appreciation of such

benefits by defendant, and (3) acceptance and retention of such benefits under such

circumstances that it would be inequitable for defendant to retain the benefit without payment of

value." *Mark Hershey Farms, Inc. v. Robinson*, 171 A.3d 810, 817 (Pa. 2017).  "The doctrine of

unjust enrichment is clearly inapplicable when the relationship between the parties is founded on

a written agreement or express contract." *Mark Hershey Farms*, 171 A.3d at 818.  Mr. Blan

argues that because the written contract does not contain any information related to his

compensation, he is not precluded from bringing an unjust enrichment claim against the

defendants.  (ECF No. 62, 25-26).  Defendants argue that the unjust enrichment claim is barred

by the existence of a written employment contract between Mr. Blan and Classic.  (ECF No. 59,

15-17).

As an initial matter, Mr. Blan concedes that Mr. Shento, the president of Classic did not

appreciate a benefit conferred by Mr. Blan, thus Mr. Blan abandoned his unjust enrichment claim

against Mr. Shento.  (ECF No. 62, 5).  Mr. Blan's claims for unjust enrichment against Classic

must likewise fail because a written contract governed the employment relationship between Mr.

Blan and Classic.  A claim for unjust enrichment exists based upon an implied contract, but in

this case, there is an actual contract, so any such unjust enrichment claim must fail.  As a result, Defendants, Mr. Shento and Classic's, Motion for Summary Judgement concerning Mr. Blan's unjust enrichment claim at Count II will be granted.

Finally, although there is no contract between Mr. Blan and Azur Enterprises, the record does not present sufficient evidence to establish any questions of material fact for Mr. Blan's unjust enrichment claim against Azur Enterprises.  The only evidence of any relevance to the unjust enrichment claim against Azur Enterprises is that it derives one-third of its revenues from Classic's profits.  Such is simply too indirect to meet the elements necessary for unjust enrichment.  As such, Defendant Azur Enterprise's Motion for Summary Judgment concerning Mr. Blan's unjust enrichment claim at Count II will be granted.

## IV.    Conclusion

In conclusion, because Mr. Blan qualifies as an employee for the purposes of the FLSA and because Classic does not qualify under the taxicab exemption, Classic is liable to Mr. Blan for violating the FLSA by not paying Mr. Blan overtime wages.  Further, there is no question of fact as to the overtime wages, $2,575.98, owed to Mr. Blan for the excess hours he worked while in Classic's employ.  However, because Classic's good faith defense is successful, Mr. Blan's Motion for Summary Judgment regarding the issue of the Defendants' good faith defense will be denied.  Additionally, Azur Enterprises does not qualify as a joint employer for purposes of the FLSA.  Thus, Azur Enterprises' Motion for Summary Judgment regarding Count I, FLSA, will be granted.  Finally, Mr. Blan has conceded that he is not pursuing his claim for unjust enrichment against Mr. Shento.  Accordingly, Mr. Shento's Motion for Summary Judgment on Count II, unjust enrichment, will be granted.  Furthermore, Defendants', Classic and Azur

Enterprises, will also succeed in their Motion for Summary Judgment on Count II, unjust enrichment.  Accordingly, an appropriate Order shall be entered.


DATE: _3/29/2021_____

Marilyn J. Horan
United States District Judge